Good morning, Your Honors. Michael Formby on behalf of Plaintiff's Appellant Wendy Latchum et al., and my co-counsel Vlad Devins is also present today in the courtroom. May it please the Court. When we originally took this case, which was before the Costo decision was filed, we felt a little bit like the ant in Frank Sinatra's song, High Hopes. If you recall, the ant was trying to move the rubber tree when everyone said, the ant can't. We took this case because we believed then as we believe now that the Plaintiff's claims against the U.S. pursuant to 28 U.S.C. 1346 fall outside the Ferry's Doctrine. At the time we filed our complaint, we were aware of the Court's unpublished opinion in that Susan Mulway was reversed in August 2000 for having applied the Ferry's Doctrine to a case involving injuries sustained by an active-duty military member while jogging on Pearl Harbor Naval Base. The testimony in that case that set forth in Judge Mulway's order, which the United States was required to address in this case, established that the Plaintiff's Schmidt was on active duty at Pearl Harbor. He took advantage of a Navy policy which permitted service members two hours for lunch if they exercised versus one and one-half hours if they did not, that he used the Special Service Center to change clothes, which was a benefit of his military service. And as a result, Judge Mulway ruled that his injury was Ferry's Bard. In her analysis, she applied the four factors that set forth in Jackson, Dreyer, and Bond. She concluded that the location on Pearl Harbor weighed in favor of a Ferry's Bard, that his active-duty status and jogging during work hours weighed in favor of a Ferry's Bard, that his use of the Special Service Center, as well as his extra one-half hour for lunch, weighed in favor of a Ferry's Bard, and finally, that his jogging on Pearl Harbor was subject to military regulations. In its memorandum opinion, the Ninth Circuit held that the Ferry's Doctrine's primary purpose was, quoting from Johnson versus U.S., to safeguard the military discipline from disruptive civil suits. Further, the Ninth Circuit held that the court should not apply Ferry's to events in which the service member was not subject in any real way to the compulsion of military orders or performing any sort of military mission. As a result, at that point, Judge Mulway having recently been reversed in Schmidt, that had been the last case before the court, we felt like an ant with high hopes. And then the Costo decision came out. And at that point, I think we were a confused ant, but still with high hopes. The impact of the Costo decision... Well, let me just say that my reaction to this is, you're arguing more about your state of mind than you are about the merits of this case. And you resort to an unpublished decision, and then quote from its quotation of some other case that has some authoritative value. And you use your argument as you like, but a great deal of this escapes me, because what the rules are and the merits of this case are more important than counsel's reaction to it or expectations or hopes or anything else. Now, I just tell you that, if it's any help. If it's not, you go ahead and make your argument. Well, Your Honor, I've concluded my arguments with Schmidt, but the reason I offered them to the court was not for the fact that, you know, that the facts happened, but for the fact that it showed that the court, as well as the parties in this case, were confronted with a chaotic, and I believe even after Costo, a chaotic situation in which we didn't know which way to go. Now, after Costo, do you know? After Costo, I still believe we do not. I believe our arguments are primarily policy first, and then four-part, four-factor analysis second. But looking at Costo, in other words, that's a published opinion of this Court. It binds this panel. And I find that, analysis-wise, you can't distinguish it from this case. Now, I can say as a matter of background that I think probably every member of this Court has had a Ferry's Doctrine case that they found extremely distasteful. But we get bound by precedent. Military people are bound by orders. We're bound by precedent. And Costo sits right in the middle of this case. And unless you can distinguish Costo on an intelligible and articulable basis, I think you're stuck. You're going to have to go to the next level. Well, let me speak about distinguishing Costo and say a couple of things in it. First, I can't tell by reading the Costo case whether or not the civilians that were on the rafting trip booked their trip through the MWR office on base. If they did not, which I take it that they did not, because I was in the military and I was not aware that civilians could book through MWR. But if they did not, then this case is materially different than the facts in Costo, because at the Waianae Army Rec Center, civilians were allowed to book cabins, and there was a civilian similarly situated at the Waianae Army Rec Center the night that Chief Warrant Officer Latcham was killed. And if that's the case, then it raises an issue that was not raised in the Costo case, although it was touched upon in the dissent, and that is the issue of equal protection, because there was a civilian who also has rights under 28 U.S.C. 1346 who can proceed in his case against the U.S. government, whereas Chief Warrant Officer Latcham cannot. So you have selective enforcement of who has the right to proceed when the parties are similarly situated. I think that is one material distinction between Costo. The other one is that I'm not aware that the plaintiffs in the Costo case were on leave. It appears that they were off-duty, and as the courts, including the Fifth Circuit, have held in the past, there is a range of duty status, from being active duty, on duty, to In this case, our client was on 11 days of leave at the time he was killed. He was not off-duty. He was on leave, which means he was not subject to the compulsion of military orders at the time of his death. And to that, the government has replied that a military member is always subject to the regulations of UCMJ, but those regulations in the UCMJ transcend the borders of any installation. If a military member goes down to Hotel Street and acts in a manner that is consistent with the UCMJ, they are still subject to those regulations. That argument, in and of itself, means nothing. The fact that he was on leave, which he had to apply for, the government had to approve, and the approval form is included in our record, distinguishes this case from Costo. Yeah, I think the opinion says that Costo was on active duty, but on liberty. Right, and liberty is not the same thing as leave. Correct. Right. But it's not any less, perhaps, active than leave, in terms of tying it to active duty. I think being on liberty is more active. In other words, you're active duty, but you're on liberty, which means you're free to do whatever you want to, but you're still on active duty. You're subject to the immediate call of the military, whereas when you're on leave, it has been approved by the military ahead of time that you can go and do whatever you want, unless there are limited circumstances where they can call you back off leave to come to do battle, to go to war, or something like that, but it is a material difference. I would also point out that in Judge Mulway's order, she states that this case is not as analogous to Dreyer as it is to Bond, and I wanted to touch upon that because I think there is a distinction there that was overlooked by the court. In the Dreyer case, the Ninth Circuit applied practice over policy. In this case, Judge Mulway applied policy over practice, and the result was that she distinguished Dreyer and opted for Bond. If you look at the language in Dreyer, it's on page 845, the Ninth Circuit held, under base regulations, use of the solo point area consisting of a small beach and boat launch area is officially limited to members of the military community and civilians who acquire use permits. In practice, the public is often able to gain access to the solo point area without acquiring a permit. In Latcham, the depositions that we took and the regulations that were provided by the Army Rec Center in accordance with rules and regulations. They have to get reservations, they have to be approved, and they can go there. The Wina Army Rec Center, by policy, is off limits to the public. In practice, however, the public is permitted to access Wina Army Rec Center, and as evidenced by the criminal record and murder in this case, the public does access prohibited areas, such as Cabin 48F's porch. If you look at the criminal history in the record, Cabin 48F had criminal activity on January 26, 1998, March 30, 1998, April 6, 1998, May 4, 1998, and on June 3, 1998, my client's husband was murdered. So the practice is not the same as the policy. In practice, they let these people walk through that compound, and the administrator testified that they don't follow the people. That's up to the security side. And who knows whether or not the security side really follows these people when they go through there. They let them use the coke machines, they let them use the showers. How do you distinguish a person in beach wear by looking at them visually as to whether they're allowed to be there, they're part of the Army approved list, or whether they're not? It's impossible. So we were distinguished from Dreyer on policy when I think we demonstrated to the court that the policy is not in practice. This case is no different than Dreyer, which I submit is the precedent that should have been followed by Judge Mowat as opposed to Costo. There's three critical distinctions there. As a policy statement, I think we at least were saying to the court that when the circuit court, and I understand that the court is bound by precedent, but we were at least saying that when the courts get to the point where they start saying that the precedent is irreconcilable, then you have to reach for something which is perhaps reaching back to the language of the act, construe it with some of the precedent, and produce a result that is meaningful and has some justice to it. We understand that there's a continuum of activities in which a military person can be injured and killed, from being killed in combat by hostile forces, being shot down by friendly fire. We understand that your honor has had a medical malpractice case and that those universally in the Ninth Circuit are held as ferries barred, but when you get beyond that to the other end, like a jogger jogging during active duty time on a Navy Pearl Harbor base, not ferries barred, and then you go further towards the right and you have a man on leave on a recreational base, run by civilians, murdered, it's hard to reconcile that case with the precedent as well as with the language of the statute. And common sense. And common sense. Your honor, we reserve some time. All right. Good morning, your honors. My name is Lowell Sergel. I'm here from the Department of Justice, representing the United States. We believe the district court correctly dismissed this case under the Ferris Doctrine based on the Costo decision and based on an unbroken line of cases from this circuit in which Costo was founded. The court in Costo, I think it's very important, noticed or mentioned that the Ferris Doctrine applied what it called three dispositive factors, and each of those factors, it's undisputed, are also present in this case, as the district court held. First of all, the warrant officer, Latcham, similar to the decedent in Costo, was on active duty when he was killed. Second, he was engaged in activity that was incident to his service because he was receiving a military benefit at the time of his death. In the Costo case, the service member was engaged in a military rafting trip that was sponsored under the military's Morale, Recreation, and Welfare program. Similarly, in this case, it's undisputed that warrant officer Latcham was permitted to be on this military facility because of his active duty status, and this also was a program run by the military under its Morale, Recreation, and Welfare program. The third factor in Costo, the court mentioned that the activity, that the program was under the command of military officers, and similarly in this case, this Morale, Recreation, and Welfare program was under the command of military officers, ultimately Major General James Hill, the commander of the 25th Infantry Division. So based on those three, again, what this court in Costo mentioned as, quote, dispositive factors that are undisputed here, we believe the district court was right to dismiss this case. My opponent has made two arguments for why Costo is distinguishable, but both of those arguments have lack merit for the reasons mentioned in our brief. First of all, it is not significant that warrant officer Latcham was on leave at the time he was injured. This court, in the Upper Grove case and in the Charlin case, applied the Ferris Doctrine to service members who were on leave when they were injured because, as here, those service members were engaging in activity and receiving military benefits, which they were entitled to because of their military service. And the court said, even if the soldier is on leave, if the person is engaged in a military program to which they're entitled because of their activity service, they have voluntarily subjected themselves to the military system and have triggered their, what the Supreme Court has called, their definitively federal relationship with the government and with the military. I would note that the Supreme Court in the Johnson case, the most recent Supreme Court opinion on the Ferris Doctrine, cited the Upper Grove case from this circuit with approval, thus suggesting that the Supreme Court thought that this court did the right thing in the Upper Grove case. And also, Judge Nelson, in the Jackson case, you applied the Ferris Doctrine, or the court did, to a service member who was on inactive reserve status at the time, which is very similar to a leave kind of status. And again, in that case, the Ferris Doctrine applied because even though the service member was on this inactive reserve status, he was able to avail himself of military benefits, in that case medical benefits, because of his active duty status. So thus, there as here, the service member invoked his military relationship with the government by receiving these military benefits under a military program, thus subjecting himself to the Ferris Doctrine. Second, the Dreyer case is distinguishable for exactly the same reasons the Costo Court found that case, found Dreyer distinguishable from that case. Dreyer itself distinguishes the prior opinion in the Bond case on the ground that in Dreyer civilians had what the court referred to as unrestricted access to the location, the military location. And this case is very different from that. In this case, civilians do have no access to the area in which Warrant Officer Latcham was murdered. The record shows, and it's undisputed, that in this facility, civilians are allowed to enter through the front gate, and they have to go by a guard to do that. And they're allowed to then walk directly to the beach. The reason for that is that in Hawaii, beaches are public property, and the civilians have a right of access to the beach. So the military, it's a good neighbor policy, allows civilians to go directly to the beach. But the record also shows that there are signs, first of all, that there are signs at the facility advising any civilian that they are not permitted to enter the cabin areas, which is where Warrant Officer Latcham was killed. The record also shows, and it's undisputed, that the military enforces this policy, and that is a significant distinction between this case and the Dreyer case. Here the record shows that the military has three security officers who are present at this installation on a 24-7 basis. One of the officers stands at the gate and checks everybody who comes in. And second, the other two officers are on roving patrol throughout this installation, which is actually a relatively small installation. There are 39 cabins, but there's a map, I should say, at page 35 of the appendix that gives you a look at what the installation is like. But it's a fairly small installation. The cabins are attached to one another for a large part, four or five at a time. And these roving patrol officers, the record's undisputed that they will walk throughout the facility, they will confront anybody who they see who looks like they don't belong there. And there are just a limited number of people there at any given time. And they will enforce these rules. They will tell them, you're not allowed to be in this cabin area, in this picnic area. So this, again, is very different from the Dreyer case, where the Ninth Circuit said, well, it's not enough just to have a rule that the civilians can't come on if the military does absolutely nothing to enforce those rules. And the rules are just a charade, essentially. That is why this case is distinguishable, again, from the Dreyer case. Two things also to say about Costo, before I stop. One is that this case is actually an easier case for the government than the Costo case in terms of applying the Ferrer's Doctrine for two reasons. The first reason is that the murder in this case occurred on a military installation. In Costo, the death occurred, I think it was 75 miles away from the closest military reservation on the Nooksack River in this rafting trip. The court in that case applied the Ferrer's Doctrine anyway, because the service member, again, was availing himself of a military benefit, the right to participate in this rafting trip at the time. But again, the courts, as you know, have looked at the site of the accident as an important factor that can support applying Ferrer's. And here, again, it's undisputed that the murder occurred on the military installation in an area that was limited only to the military people and their guests and families and DOD civilian employees, similar to what the rules were in Costo. That's the way the MRW programs work. For obvious reasons, the purpose of these programs is to support morale among members of the military. We know from common knowledge that because of long deployments and the stress of service, and particularly now that we have a volunteer contract army, it's critical for the military to provide these kinds of opportunities for service members to get away from it all a few years with guests and civilians, friends, and to basically, again, prepare themselves for the arduous work that they do. So again, that is why this case is similar to the Costo, and in fact, again, the point is this case is better than Costo because it occurred on a military facility. Second, this case also is easier than Costo for the government because the allegations of negligence in this case go even more directly to military matters than the allegations did in the Costo case. If you look at the complaint in this case, what the plaintiff really is alleging is that the military was negligent in how it assigned security guards to this facility, how it controlled them, trained them, how essentially it provided for the security of the people, the military of this facility because of their military status. That goes directly to the management of the military and the relationship, again, between the military and the soldiers who are on active duty status. The Supreme Court in the Shearer case, this court in the McAllister case, and courts across the country have said that there's no right for a soldier or his, unfortunately in this case, his estate to challenge core military decisions going to how the military provides for security and safety of its people. As the record also shows, finally I would mention that security in this case also was under the command of military individuals. The first line military person was the Provost Marshal, at that time Rose Miller. She decided, again, what the security arrangements would be for this institution, decided who would be there, how many guards there would be. Sometimes, in fact most frequently, the guards are DOD civilian guards, but sometimes she would assign MPs to be at this installation as well because for one thing, this installation is not only used for recreational purposes, but also for official military meetings by brass, by military brass. Fort Shafter provided the weapons that these DOD civilian officers used. So for that reason, Your Honor, I believe, again, this case is, if anything, easier for the government to apply the Farris Doctrine than the Costo decision. For all those reasons, Your Honor, we believe the court should affirm the district court's ruling and the district court's really fine and thorough opinion based on the Costo decision. If there are no further questions, I have no further. Thank you. Your Honor, just a couple of follow-up comments. First, I take it that I read Dreyer a little differently than opposing counsel. My reading of it is that the civilians did not have unrestricted access to the solo point boat launch area. The way I read the decision is that the civilians had to get a use permit, but in practice, the public often accessed the facility. And I think that's the same situation we had at the Wai'anae Army Rec Center. Civilians in order to stay there had to get a permit. The public was allowed to walk through. Whether or not the public stayed within the sidewalk that went right to the beach, no one knows. And there's nothing in the record that shows that there was a sampling to see how many of the public strayed from that area. We simply don't know. What is in the record is a history of criminal activity that seems to demonstrate that activity takes place in prohibited areas, regardless of whether or not there's a sign posted. And counsel's reference to the sign, once again, is showing, please give us a ferry's bar on policy, regardless of the practice. And I think that's an unjust argument. As far as military morale, civilians are allowed to stay there. When civilians stay there, it doesn't serve a military purpose. It doesn't benefit the military. I think it's possible to recreate without exercising a military purpose. There's no military nexus, necessarily, between recreating on the weekends. I think that's a policy statement, and it serves their purpose to write policies that say these things. But in practice, if you go down and you ask a military member, are you recreating so that you can improve your morale in the event you go to war? I don't think you're going to get a yes answer from these gentlemen or from these women. Also, when it comes to military matters, counsel used a phrase, core military decisions, which we touched upon in our brief. And the point that I made in the brief is that what makes a judgment or a decision a military judgment, military decision? I don't believe that every decision or judgment made by a person wearing military on their rank is a core military decision. And the decisions that we are questioning in our lawsuit were primarily applied by civilians in this case. C.W. O'Latcham didn't even know Lieutenant Colonel Cardinal or Lieutenant Colonel Miller or the installation commander. These people were way above him. There's no fear on the part of the courts that they are going to somehow second guess a relationship between those individuals. There was no relationship there. And the last point I'd like to make is that the Federal Tort Claims Act process is initially and primarily first an administrative process. If the military would fairly and appropriately assess these cases for negligence and settlement value, the courts would never have to second guess these cases, or at least a large percentage of them. But what the military does is routinely deny all military claims under the Federal Tort Claims Act, knowing that the courts will knock 95 percent of them out under the Ferries Doctrine. And then you've got to deal with 5 percent. But the courts would not be second-guessing military decisions if they would use the administrative part of this process the way it is supposed to be used. And I have filed Federal Tort Claims actions on behalf of dependents, wives of military members, and they've settled them and they've paid. It's really a policy statement here by the military. Nothing further. All right. Thank you very much. We appreciate the arguments. And the case just argued. It will be submitted for decision. And we'll go to the last case. Thank you.
judges: Leavy, Rymer, Tg Nelson